J. S52015/16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF:  B.A.C., | : | IN THE SUPERIOR COURT OF |
| A MINOR | : | PENNSYLVANIA |
| | : | |
| APPEAL OF:  J.W., A/K/A J.C., MOTHER | : | No. 3546 EDA 2015 |

Appeal from the Order Dated September 8, 2015,
in the Court of Common Pleas of Philadelphia County
Family Court Division at Nos. CP-51-AP-0000465-2014,
CP-51-DP-0000143-2013

| | | |
|---|---|---|
| IN THE INTEREST OF:  J.L.C., | : | IN THE SUPERIOR COURT OF |
| A MINOR | : | PENNSYLVANIA |
| | : | |
| APPEAL OF:  J.W., A/K/A J.C., MOTHER | : | No. 3548 EDA 2015 |

Appeal from the Order Dated September 8, 2015,
in the Court of Common Pleas of Philadelphia County
Family Court Division at Nos. CP-51-AP-0000466-2014,
CP-51-DP-0000144-2013

BEFORE:  FORD ELLIOTT, P.J.E., STABILE AND STRASSBURGER,* JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED JULY 11, 2016**

J.W., a/k/a J.C., ("Mother") appeals from the decrees and orders entered September 8, 2015, in the Court of Common Pleas of Philadelphia County, Family Court Division, granting the petitions of the Philadelphia Department of Human Services ("DHS") and involuntarily terminating her parental rights to her minor adoptive children, B.A.C., born in February of 2009, and J.L.C., born in May of 2005 (collectively, the "Children"), pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8), and (b), and changing the

_____

* Retired Senior Judge assigned to the Superior Court.

permanency goal to adoption pursuant to 42 Pa.C.S.A. § 6351.[1]  In addition,

on March 15, 2016, Mother's counsel filed a petition to withdraw, together

with an **Anders**[2] brief, averring the within appeal is frivolous.  After review,

we grant counsel's petition to withdraw and we affirm.

The relevant procedural and factual history was summarized by the

trial court as follows:

> This case initially became known to the
> Department of Human Services ("DHS") on
> January 18, 2013 when DHS received a General
> Protective Services ("GPS") report alleging that
> J.L.C. had sustained a contusion on his head after
> Mother repeatedly banged his head on the floor until
> he stopped crying.[3]  The report stated that J.L.C.
> was a special needs child after being diagnosed with
> Dandy Walker Syndrome (congenital brain
> malfunction).  The report also alleged that Mother hit
> B.A.C. (who is a blind child) on his hands as a form
> of punishment.  On the same day, an Order of
> Protective Custody ("OPC") was obtained for J.L.C.
> after he reported that he was afraid to return home
> to Mother.  On January 18, 2013, DHS obtained an

---

[1] Mother adopted J.L.C. and B.A.C. as a single parent.  (Decrees of involuntary termination of parental rights, 9/8/15 at 1; petitions for involuntary termination of parental rights, 9/10/14 at 1.)

[2] **Anders v. California**, 386 U.S. 738 (1967).

[3] DHS social worker, Clarence Tillman, testified that he became acquainted with the family just days prior, on January 16, 2013, in relation to another child in the family, I.  (Notes of testimony, 9/8/15 at 34.)  Mother's parental rights to I. were subsequently terminated.  (DHS petition for involuntary termination of parental rights, 9/10/14, Exhibit "A," Statement of Facts, at ¶bb.)

OPC for B.A.C. because the child was non-verbal and could not say whether he was safe.[4]

On January 28, 2013, the Court adjudicated the Children dependent and committed them to DHS. In the Court order for the adjudication, the Assessment and Treatment Alternative ("ATA") evaluation stated:

> "[Mother] asserts [that] all allegations and/or reports of her engaging in negative and/or abusive behaviors with her children (biological, adopted, and/or foster) are false and multiple people are lying when reporting these allegations. Given [Mother] presents a pervasive pattern of consistently altered versions of events spanning across different children and different allegations there are ongoing concerns regarding her capacity to provide for the children's safety."

During the evaluation, Mother admitted "to occasionally hitting her children on the buttocks," especially when one child had temper tantrums. In particular, Mother felt that corporal punishment was "needed because of her history of severe behavioral problems" with another child. The ATA evaluator concluded that in order for Mother to be reunified with her children, she would have to "explore her role in DHS' involvement in her life with her as an identified perpetrator of abuse in therapy."

The hearing on the Petition for Involuntary Termination of Parental Rights was held on September 8, 2015. During the hearing, the Court heard from five witnesses: Dr. Erica Williams (ATA Forensic Psychologist), Clarence Tillman (DHS Social Worker), Jessica Stone (Northeast Treatment Center ("NET") social worker, Emily Slook (Children's Crisis

---

[4] A review of the record reveals that the OPC for B.A.C. was obtained on January 19, 2013. (DHS Exhibit 3.)

Treatment Center "CCTC" trauma clinician), and Mother.

. . . .

After closing arguments, the Court made the following findings as to the credibility of the witnesses: 1) Dr. Williams was credible and her testimony accepted in full; 2) Mr. Tillman was credible and his testimony was accepted in full; 3) Ms. Slook was credible and her testimony accepted in full; 4) Ms. Stone was credible and her testimony was accepted in full; 5) Mother's testimony was not credible and her testimony was not accepted in full.

The Court accepted the testimony of Mother slapping the hands of B.A.C. and "knowing [B.A.C.'s] condition []. . .[] there is no excuse for [M]other to slap [B.A.C.'s] hands or to do anything that would cause him harm because of his condition. And the fact that [Mother] cannot accept, or realize that fact is concerning to the Court." The Court further found that "mom did harm these children. . .[.] [Mother] attempts to manipulate the children instead of dealing with her own mental health issues[] [c]ausing her children to be unsafe."

The Court stated that "It's the parents' duty to love, protect, and support their children. But a parent cannot meet these goals if a parent does not realize that they can't protect the child because of deficits the parents may have."

The Court found that DHS had met its burden and presented clear and convincing evidence to support the termination of Mother's parental rights under 23 Pa. C.S. §§ 2511(a)(2), [](5), and (8) of the Adoption Act. Pursuant to 23 Pa. C.S. § 2511(b) the Court further found that while a bond exists between Mother and the B.A.C., it is not a parent-child bond. The Court found that based on the evidence, it was in the best interests of the Children to be adopted and granted the termination

> of Mother's parental rights on September 3, 2009
> based on 2511(a)(1), and (2) and 2511(b). . . .[5]

Trial court opinion, 2/1/16 at 1-6 (footnotes omitted; citations omitted).

By letter dated October 21, 2015, and addressed to Supervising Judge Walter Olszewski, Mother requested the ability to appeal the termination of her parental rights ***nunc pro tunc***. (Letter, 10/21/15.) On October 30, 2015, the trial court granted Mother permission to file an appeal ***nunc pro tunc***, and appointed counsel for purposes of appeal. (Order, 10/30/15.) Thereafter, Mother, through appointed counsel, filed timely notices of appeal and concise statements of matters complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b) on November 20, 2015. This court ***sua sponte*** consolidated the appeals on January 20, 2016.

On appeal, Mother raises the following issues for review:

> Whether under the Juvenile Act, 42 Pa.C.S.A. Section 6351, and 55 Pa. Code section 3130.74, in accordance with the provisions of the Federal Adoption and Safe Families Act, 42 U.S.C. Section 671, et seq., reasonable efforts were made to reunite the mother with her child[ren] and whether the goal change to adoption was the disposition best suited to the safety, protection and physical, mental and moral welfare of the child[ren][?]
>
> Whether it was proven by clear and convincing evidence that Mother's parental rights should be terminated under Sections 2511 (a)(2), (5), (8) and 2511 (b)[?]

---

[5] A review of the record reveals that on September 8, 2015, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8), and (b). On the same date, the trial court additionally entered an order changing the permanency goal to adoption.

*Anders* brief at 6 (unnecessary capitalization omitted).

When counsel files an *Anders* brief, this court may not review the merits of the appeal without first addressing counsel's request to withdraw. *Commonwealth v. Washington*, 63 A.3d 797, 800 (Pa.Super. 2013). *See also Commonwealth v. Rojas*, 874 A.2d 638, 639 (Pa.Super. 2005) (stating, "[w]hen faced with a purported *Anders* brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw[]"(citation omitted)). In *In re V.E.*, 611 A.2d 1267 (Pa.Super. 1992), this court extended the *Anders* principles to appeals involving the termination of parental rights. *Id.* at 1275. It follows, counsel appointed to represent an indigent parent on a first appeal from a decree involuntarily terminating parental rights may petition this court for leave to withdraw representation and submit an *Anders* brief. *In re S.M.B.*, 856 A.2d 1235, 1237 (Pa.Super. 2004). To withdraw, pursuant to *Commonwealth v. Millisock*, 873 A.2d 748 (Pa.Super. 2005), and its progeny, counsel must:

> 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [*Anders*] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.

*Commonwealth v. Cartrette*, 83 A.3d 1030, 1032 (Pa.Super. 2013) (*en banc*), citing *Commonwealth v. Lilley*, 978 A.2d 995, 997 (Pa.Super. 2009). *See also Commonwealth v. Orellana*, 86 A.3d 877, 880 (Pa.Super. 2014). We further review counsel's *Anders* brief for compliance with the requirements set forth in *Commonwealth v. Santiago*, 978 A.2d 349 (Pa. 2009).

> [W]e hold that in the *Anders* brief that accompanies court-appointed counsel's petition to withdraw, counsel must: (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Id.* at 361. "Once counsel has satisfied the above requirements, it is then this Court's duty to conduct its own review of the trial court's proceedings and render an independent judgment as to whether the appeal is, in fact, wholly frivolous." *Commonwealth v. Goodwin*, 928 A.2d 287, 291 (Pa.Super. 2007) (*en banc*), quoting *Commonwealth v. Wright*, 846 A.2d 730, 736 (Pa.Super. 2004).

Counsel has satisfied the first requirement of *Anders* by filing a motion to withdraw, wherein he asserts that he has made a conscientious review of the record and determined the appeal would be frivolous.

Likewise, counsel has satisfied the second requirement by filing an **Anders** brief that complies with the requirements set forth in **Santiago**, **supra**. With respect to the third requirement, counsel has attached to the motion to withdraw a copy of the letter sent to Mother advising her of her rights, and enclosing a copy of the **Anders** brief. Hence, we conclude that counsel has complied with the **Anders** requirements and proceed to a review of the merits, commencing with the issue of involuntary termination first.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." **In re Adoption of S.P.**, 616 Pa. 309, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." **Id.** "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." **Id.** The trial court's decision, however, should not be reversed merely because the record would support a different result. **Id.** at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. **See In re R.J.T.**, 9 A.3d at 1190.

**In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013).

The termination of parental rights is guided by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated

analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*).

In this case, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5), and (8), as well as (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), well as Section 2511(b). *In re B.L.W.*, 843 A.2d 380, 384

(Pa.Super. 2004) (**en banc**). Here, we analyze the court's termination pursuant to Sections 2511(a)(2) and (b), which provide as follows:

### § 2511. Grounds for involuntary termination

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first examine the court's termination of Mother's parental rights under Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015), quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002).

In the case at bar, in discussing Subsections 2511(a)(2), (5), and (8), the trial court noted Mother's continued lack of appreciation of any wrongdoing and highlighted the testimony of Dr. Erica Williams that Mother did not have the capacity to parent the Children, which was not disputed. (Trial court opinion, 2/1/16 at 9-10.)

> Here, we have a case of a mother who refuses to acknowledge her role in jeopardizing the safety of the Children. Further, Mother reported to Dr. Williams, the ATA evaluator, that she believes that the numerous reports and allegations against

her are a result of malicious jealousy. Mother's lack of acknowledgement of any wrong behavior and contribution to the safety of the Children is of itself a safety concern. Throughout the termination hearing Mother has denied any abuse of the Children and denies all of the claims from the many abuse allegations. This Court found Mother's testimony not credible.

Mother's ATA evaluation and the testimony of Dr. Williams showed that Mother did not have the capacity to parent [the Children]. There was no other expert testimony presented to dispute Mother's parental capacity. Therefore, based on the evidence, Dr. Williams's testimony was uncontested and found to be credible by this Court.

*Id.* at 9-10 (citations to record omitted).

A review of the record supports the trial court's finding of the basis for termination under Section 2511(a)(2). Dr. Williams, who conducted a parenting capacity evaluation of Mother in October 2013, testified that Mother did not have the capacity to parent the Children.[6] (*Id.* at 7.) Dr. Williams explained the basis of this opinion as follows:

The [concerns] were that DHS raised concerns with [I.] that she had abandoned [I.]. With [J.L.C.], there was [sic] concerns that she had physically harmed him and she was identified as the perpetrator for that. That she physically disciplined [B.A.C.] who at the time could not hear or see and was lacking multiple kind [sic] of sensory ways to communicate as well as concerns that she wasn't taking any responsibility for those behaviors. When I asked her about these different behaviors she denied that any of them occurred, she provided alternate accounts of each concern, in terms of abandoning [I.], she explained she did that with

---

[6] Dr. Williams report was marked as DHS Exhibit 13.

DHS, they coordinated because that was in his best needs, and he wouldn't be able to get the care he needed if she didn't sign off on abandonment. When I spoke to Mr. Tillman he was very clear that that was not the sequence of events that she actually told Mr. Tillman she did not want [I.] in her care because he sexually abused her older biological daughter [B.]

When we discussed [J.L.C.], she denied that she ever banged his head on the floor. She denied reports that the nurse witnessed her physically fight him, restrain him, and bring him down to the floor. She did report that she would occasionally discipline him on the buttock. She said that she knew that that was wrong, that she wasn't supposed to do it. But she engaged in it to prevent him to turn out like [I.]

In regards to [B.A.C.], she did not speak whether or not she physically disciplined him, and there was no direct concerns for [B.A.C.] regarding [J.].

She also reported historical concerns to include she was alleged to have sexually abused [I.], and in discussing all of these concerns she said that other people made those reports because they were jealous. When concerns were raised that [J.L.C.]'s therapist said he was being coached[] to recant the abuse, and he said that his mother had learned his lesson and that he deserved to be beat, she said that anything the therapist said was false.

So, there was this pattern of over different children, over different years, over different reporters, she denied everything, and provided alternate version of events.

Regarding [J.L.C.]'s injury, she felt that he was confused, that it happened on the bus, and that the school is retaliating against her because she identified concerns of [B.A.C.] the week prior.

*Id.* at 7-9.

- 13 -

Moreover, Dr. Williams expressed concern for the safety and permanency of B.A.C. given his inability to speak to and convey his welfare. (*Id.* at 13-14.) Dr. Williams stated:

> There's significant concerns because it turns out that this physical discipline had been occurring in excess by reports of witnesses to include physical fighting, throwing on the floor, the beating of the head of [J.L.C.] to the ground and that stopped because [J.L.C.] was able to speak up, [J.L.C.] was able to voice his concerns.
>
> From what I understand of [B.A.C.]'s limitations, he does not have that opportunity, he is not able to speak up and say that I'm not comfortable, I'm not safe[,] I'm not feeling well.

*Id.* at 14.

Further, DHS social worker, Clarence Tillman, additionally expressed concerns regarding Mother's "ability to parent to keep the kids safe." (*Id.* at 48.) Mr. Tillman related that the Children's foster families consistently requested no contact with Mother. (*Id.* at 48.) Likewise, Mr. Tillman confirmed that Mother never completed her Family Service Plan ("FSP") goal of individual therapy, which remained an objective throughout the case, noting a gap between January 2014 and March 2015. (*Id.* at 52-53, 56.) Relatedly, Mother continues to deny responsibility for her role in J.L.C.'s injury and the Children being in care, and in fact, there was concern that Mother's therapy was not addressing this issue. (*Id.* at 53-56). Hence, the record substantiates the conclusion that Mother's repeated and continued incapacity, abuse, neglect, or refusal has caused the Children to be without

essential parental control or subsistence necessary for their physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Moreover, Mother cannot or will not remedy this situation. *See id.*

We next determine whether termination was proper under Section 2511(b). With regard to Section 2511(b), our supreme court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, 620 A.2d at 485, this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267. "[I]n cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa.Super. 2010) (citations omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as

well. Additionally, Section 2511(b) does not require a formal bonding evaluation." ***In re Z.P.***, 994 A.2d 1108, 1115-1116 (Pa.Super. 2010) (internal citations omitted).

In the instant matter, the trial court indicated that it was "satisfied that grounds for termination under § 2511(b) of the Adoption Act were established by clear and convincing evidence," stating:

> One of the core sources for the strength of a parental bond are the visits between Mother and the Children. The main purpose for offering parents visitation with their children is to "preserve the unity of the family whenever possible or to provide another alternative permanent family when the unity of the family cannot be maintained." 42 Pa.C.S.A. § 6301. In this case, Mother's visits with J.L.C. were terminated over two years prior to the termination hearing. Testimony was presented that J.L.C. had already separated himself from Mother mentally. B.A.C. is, by Mother's admission, in an excellent placement with his former night nurse. There was no evidence presented at trial to show that the Children would suffer irreparable harm if Mother's parental rights were terminated. Further, there was no request for a bond evaluation nor were [sic] there any credible testimony of a parent-child bond between Mother and the Children.

Trial court opinion, 2/1/16 at 11 (citations to record omitted).

Here, the record likewise corroborates the trial court's termination pursuant to Section 2511(b). Initially, we note that, although Mother had visitation with the Children, this visitation was not unsupervised. (Notes of testimony, 2/1/16 at 40, 89-90.) Notably, visitation initially occurred at the "kinship home," which became problematic as a result of Mother. (***Id.*** at

40-41.) Additionally, thereafter, subsequent to a prior hearing in 2013, the trial court discontinued visitation between Mother and J.L.C.[7] (*Id.* at 42.) Of concern, while Mother and J.L.C. therefore do not have visitation, there is visitation between J.L.C. and his sibling, J.,[8] who still resides with Mother, and Mother sent presents and cards to J.L.C. through J. (*Id.* at 46-47.) DHS social worker, Clarence Tillman, stated:

> [T]he problem that it's causing is that she's brought him toys, watch [sic], stuff like that, and of course when [foster father] takes it from him it's making him to believe [sic] to be the bad guy, and the bad parent. So, this was a major source of concern for me. So I talked to Carson Valley, [sic] the worker had quit. [sic] In between workers as we speak but, in fact, mom told me today we have a new worker and they have done another sibling visit. I was tempted to stop the sibling visits simply because [J.L.C.] is at a good place. He's in a home that he loves, he wants to be in, they love him. So, I was torn because I know the love he has for his brother. So I let them go on anyway.

*Id.*

Mr. Tillman, testified that J.L.C. no longer has a parent/child relationship with Mother, but rather does with his current foster family with whom he has been placed since August 2014. (*Id.* at 56-57.) Mr. Tillman related how happy J.L.C. is in his current home, stating, "[T]his is the

---

[7] Visitation with regard to B.A.C. was terminated at that time as well, but was reinstated by this court on appeal and commenced again in approximately July 2014. (Notes of testimony, 9/8/15 at 69, 87.)

[8] J. is J.L.C.'s biological brother. (*Id.* at 46.)

happiest I've ever seen him. He no longer wants to go home; he hasn't wanted to go home in over a year." (*Id.* at 45, 58.) As to J.L.C.'s progress, Mr. Tillman further offered:

> He's the little man of the house -- pretty much, he's the little man of the house. He worships the ground that [foster father] works [sic] on. [Foster father] talks about him so proudly and some amazing [sic]. He's doing, he lost weight, he's grown, he's trying school this year without Wraparound services, he did amazing over summer camp. He's doing wonderful.

*Id.* at 58. Consequently, Mr. Tillman unwaveringly affirmed that it was in the best interest of J.L.C. for Mother's rights to be terminated and that this would not cause J.L.C. "irreparable harm" or "detriment[]." (*Id.* at 45, 48, 57-58.) As Mr. Tillman opined, this was because "[h]e's mentally already separated. . . . [H]e's already done it himself mentally." (*Id.* at 57-58.)

Similarly, J.L.C.'s therapist from Children's Crisis Treatment Center, trauma clinician, Emily Slook, testified that "if [J.L.C.] were to be removed from his current foster family that it would do more harm than good." (*Id.* at 77.) Moreover, Ms. Slook indicated that J.L.C. "is very stable right now." (*Id.* at 75.) Significantly, she attributed this to a foster family that is "able to provide a safe and stable structured environment and who are also supportive of trauma treatment, and who are nurturing to the child as well. And J.L.C. is receiving all of those needs from his current foster family." (*Id.* at 76.)

With regard to B.A.C., Jessica Stone, NET case manager, who supervised Mother's visits with B.A.C., testified to a relationship between Mother and B.A.C., indicating, "He knows who his mom is, he communicates with her. He's excited to see her. He's excited during the visit, he's sad when the visit is over." (*Id.* at 82.) However, Ms. Stone stated that she could not answer when asked if she thought it would cause irreparable harm if Mother's rights were terminated. (*Id.*) Further, she noted that B.A.C. "responds well" to his foster parents. (*Id.* at 83.)

DHS social worker, Clarence Tillman, also acknowledged the bond between Mother and B.A.C. (*Id.* at 50, 59.) Nonetheless, Mr. Tillman testified that this was not a parent/child bond. (*Id.* at 59.) What is more, Mr. Tillman instead emphasized the bond between B.A.C. and his caregivers.[9] (*Id.* at 50, 59.)

> [B.A.C.] is being cared for, especially right now, he's probably in the best home he's ever been in. Don't get me wrong he know's who [Mother] is, and he does have a bond with her but it wouldn't be detrimental, because his main care believe it or not really comes from his nurses. I mean, he's so bonded with his nurses, like almost like -- well, where's he's at now used to be his former nurse so that would explain it. So it's a bond [sic] child bond. And he's crawling all over the floor he's trying to walk, he's doing amazing things.

---

[9] B.A.C. required and received care due to his numerous medical conditions. (Notes of testimony, 9/8/15 at 64; DHS Exhibit 4 at 2, DHS Exhibit 7 at 2; DHS petition for involuntary termination of parental rights, 9/10/14, Exhibit "A," Statement of Facts, at ¶o.)

*Id.* at 50. As a result, Mr. Tillman stated that it would be in the best interest of B.A.C. for Mother's parental rights to be terminated and would cause him no "irreparable harm" or "detriment[]." (*Id.* at 48, 50, 59.) Thus, as confirmed by the record, the emotional needs and welfare of the Children favor termination. Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Mother's parental rights under 23 Pa.C.S.A. §§ 2511(a)(2) and (b).

We lastly turn to whether reasonable efforts were made at reunification of Mother and the Children, and whether the trial court appropriately changed the permanency goal to adoption. In so doing, we first note that our supreme court has held that Section 6351(f) does not require reasonable efforts as it relates to termination of parental rights. *In re D.C.D.*, 105 A.3d 662, 673-674 (Pa. 2014).

> [W]hile reasonable efforts should be considered and indeed, in the appropriate case, a trial court could insist upon their provision, we hold that nothing in the language or the purpose of Section 6351(f)(9) forbids the granting of a petition to terminate parental rights, under Section 2511, as a consequence of the agency's failure to provide reasonable efforts to a parent.

*Id.* at 675. Thus, we find this portion of Mother's claim to be without merit.

As to a change in permanency goal, we note that our standard of review is the same abuse of discretion standard as noted above. *In the Interest of L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015), citing *In re R.J.T.*, 9

A.3d 1179, 1190 (Pa. 2010) (for proposition that the abuse of discretion standard applies in a dependency matter). Further, following an examination and findings of factors provided in 42 Pa.C.S.A. § 6351(f) and (f.1), regarding matters to be determined at the permanency hearing, the trial court must also find that a goal change is in Child's best interests. **See** 42 Pa.C.S.A. § 6351(g); **In re R.J.T.**, 9 A.3d 1179 (Pa. 2010).

The primary purpose of the disposition of a dependent child is to examine what is in the best interest of the child. 42 Pa.C.S.A. § 6351(a); **In the Interest of Z.W., et al.**, 710 A.2d 1176, 1178 (Pa.Super. 1998). **See also In re Tameka M.**, 580 A.2d 750, 753 (Pa. 1990) (stating, "In ordering a disposition under Section 6351 of the Juvenile Act, the court acts not in the role of adjudicator reviewing the action of an administrative agency, . . . rather the court acts pursuant to a separate discretionary role with the purpose of meeting the child's best interests," quoting **In re Lowry**, 484 A.2d 383, 386 (Pa. 1984)).

In the case at bar, as indicated, Mother failed to comply with all FSP goals and objectives; namely, individual therapy. (Notes of testimony, 2/1/16 at 52-53, 56.) Further, DHS social worker, Clarence Tillman, testified as to his belief that it is in the best interest of the Children for the goal to be changed to adoption. (**Id.** at 45, 48.) Therefore, the record supports that a goal change was in Children's best interests. Accordingly, after review of the record, we again discern no abuse of discretion and

conclude that the trial court properly changed the permanency goal to adoption.

Based on the foregoing independent analysis of the trial court's termination of Mother's parental rights and change of permanency goal, we agree with counsel for Mother that the within appeal is wholly frivolous.[10]  As such, we affirm the decrees and orders of the trial court and grant counsel's petition to withdraw.

Decrees and orders affirmed.  Petition to withdraw granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/11/2016

---

[10] Further, we note that our independent review of the record did not reveal any additional, non-frivolous issues overlooked by counsel.  **See Commonwealth v. Flowers**, 113 A.3d 1246, 1250 (Pa.Super. 2015), citing **Commonwealth v. Goodwin**, 928 A.2d 287 (Pa.Super. 2007) (**en banc**).